**Prepared By:**
**Michael Jones, CA Bar No. 271574**
**M. Jones & Associates, PC**
**505 North Tustin Ave, Suite 105**
**Santa Ana, CA 92705**
**Telephone: (714) 795-2346**
**Facsimile:    (888) 341-5213**
**Email:  mike@MJonesOC.com**

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

In Re:

   ALBERT TORRES, JR.,

   AND

   KATHERINE LEA TORRES,
                       Debtor(s).

   ALBERT TORRES, JR.,

   AND

   KATHERINE LEA TORRES
                       Movants,

     VS.

   MICHAEL ROENNAU,

                     Respondents.

**In Chapter 7 Proceedings**

**Case No. 8:16-bk-12250-MW**

**MOTION FOR SANCTIONS AND
DAMAGES RESULTING FROM
DISCHARGE VIOLATIONS**

**<u>HEARING</u>**

Date: TBD – Order to Show Cause Requested
Time: TBD
Ctrm: TBD

**TO THE HONORABLE MARK WALLACE, UNITED STATES BANKRUPTCY**

**JUDGE, MICHAEL ROENNAU, AND OTHER INTERESTED PARTIES:**

ALBERT TORRES, JR., AND KATHERINE LEA TORRES, debtors in the above captioned

Chapter 7 bankruptcy proceeding, and hereinafter referred to collectively as "Debtors", by and through their undersigned counsel, will and hereby do move this Court for an Order finding MICHAEL ROENNAU to be in violation of the discharge order entered in this case on 19 September 2016, and awarding them damages in an amount not less than $1,743,500.00.

This Motion is made pursuant to 11 U.S.C. § 524, which provides that the discharge order creates an injunction prohibiting collection activity against the Debtor, and 11 U.C.S. § 105(a) which authorizes this Court to issue "any order, process, or judgment" necessary or appropriate to carry out the provisions of the Bankruptcy Code.

This Motion is based on the Memorandum of Points and Authorities, the Declaration of Michael Jones, the Declaration of Albert Torres, Jr., the Declaration of Katherine Lea Torres, and such other and further oral and documentary evidence as may be presented at the hearing on this Motion.


Respectfully Submitted this 26 May 2017.


                                        **M Jones & Associates, PC**
                                        Attorneys for Debtors


                                        Michael Jones

# MEMORANDUM OF POINTS AND AUTHORITIES

In support of their motion, the Debtors submit as follows:

## STATEMENT OF FACTS

1.      Movants and Debtors are the filing debtors in the above captioned bankruptcy case, and are individuals residing in Orange County, California.

2.      Debtors allege on information and belief that Creditor and Respondent Michael Roennau is an individual residing in Los Angeles County.

3.      On 28 May 2016, the Debtors filed the above captioned proceeding under Chapter 7 of Title 11 of the United States Code (hereinafter "the bankruptcy case") by filing a voluntary petition for relief.

4.      At the time of the filing of the bankruptcy case, debtors allegedly owed money to Creditor and Respondent Michael Roennau (hereinafter "Roennau") and as such, Roennau was properly scheduled in the bankruptcy case as a creditor.  The amount of the debt owed to Roennau was disputed by Debtors, and was thus scheduled in the amount of "Unknown" and designated as "disputed".  A copy of the schedule listing their debt is attached hereto as Exhibit A.

5.      Prior to the filing of the bankruptcy case, the debtors were in the process of opening a pastry shop called "Le Pop Shop", and operated their business affairs through a California limited liability company called Le Pop Shop, LLC (hereinafter referred to as "the business").

6.     The business was formed by the filing of an operating agreement with the California Secretary of State, attached hereto as Exhibit B.  Thereafter, on or about 21 May 2015, Debtors executed a First Amended Operating Agreement that provided for Roennau to contribute $125,000 for a 25% interest in the business; a copy of the First Amended Operating Agreement is attached hereto as Exhibit C.

7.     Due to various problems related to the build-out and design of a retail location for a pastry shop, the business was unable to open its retail operations, and ultimately failed.

8.     On 2 May 2016, the Debtors called the law firm of M Jones & Associates, PC, seeking information about a possible bankruptcy filing. The failure of the business was a large contributing factor to the Debtors' initial decision to pursue a bankruptcy case.

9.     Prior to filing the bankruptcy case, the Debtors met and consulted with their attorney, Michael Jones, about their financial affairs and how a bankruptcy case might provide them with financial relief.  The Debtors specifically expressed concern about the debts that had been incurred related to the business.  The Debtors' concern was that the Debtors would be sued by their creditors even though a bankruptcy case had been filed.

10.     Debtors' counsel advised that upon the filing of the case, the bankruptcy stay would go into effect and no creditor, except under very limited circumstances, could pursue collection activities without first being granted relief from the stay.  Further, none of the limited circumstances exempted from the automatic stay under 11 U.S.C. §362 applied to the business debt.  As such, the debtors were advised that their creditors would not be able to file suit against them personally on the debt after the case was filed because the automatic stay would protect them.   Then, once the discharge entered in their case, they would be protected thereafter by the discharge injunction that prohibits collection activity from creditors in the bankruptcy case.

BATES: 0004

11.     Unknown to the Debtors at the time of their bankruptcy filing, Roennau filed a civil lawsuit against the Joint Debtor, Katherine Lea Torres (hereinafter "the Joint Debtor"), in the Orange County Superior Court of the State of California on 20 May 2016, approximately one week prior to the Chapter 7 filing.  The Superior Court case was captioned *Michael Roennau v. Katherine Lea Torres; Le Pop Shop LLC; and Does 1 through 100*, Orange County Superior Court, Case Number 30-2016-00853829-CU-FR-CJC, and is hereinafter referred to as "the suit" or "the State Court case".

12.     On 28 May 2016, the Debtors met with Michael Jones of M Jones & Associates, PC, to prepare and file their Chapter 7 bankruptcy case, which was filed that day, initiating the automatic stay provisions of 11 U.S.C. §362.

13.     Roennau attempted to serve the suit on the Joint Debtor on 2 June 2016, a few days after their bankruptcy case had been filed.  Having been alerted that a suit was out for service, the Debtors contacted their bankruptcy counsel, Michael Jones (hereinafter "Debtor's counsel"), to advise him of the collection activity.   It was unknown who had filed suit at this time, so Debtor's counsel advised the Debtors that the service of the suit on the Joint Debtor would be a violation of the automatic stay, but that any debt allegedly owed could be addressed in the bankruptcy case.

14.     Although advised of the protection of the automatic stay, it was clear to Debtor's counsel that the Debtors were unusually fearful of the suit that had been filed against them.  The Debtors then went into greater details of their past business dealings with Roennau, and appeared terrified that he was suing them on the business debt.  Significant time and effort was needed to calm the debtors, and they were assured that they were protected by the bankruptcy case and did

not need to be concerned.  Debtor's counsel requested that if the Debtors were actually served

with a lawsuit, they should forward it to Debtor's counsel's right away.

15.     On 6 June 2016, Roennau had a process server serve the Joint Debtor with a copy of

the suit.  Thereafter, the Debtors provided a copy of the suit to Debtors' Counsel who sent direct

correspondence to Roennau's attorney advising of the bankruptcy case and requesting that all

collection activity cease immediately.  A copy of the direct notice provided to Roennau's counsel

is attached hereto as Exhibit D.

16.     On 11 July 2016, Debtors again met with their attorney to prepare for their

bankruptcy creditor's meeting pursuant to 11 U.S.C. § 341.  Once again, Debtors expressed

grave concerns that Roennau would sue them for the debt they had incurred regarding the

business.  Debtor's counsel attempted to calm their fears by stating that the they were protected

by the automatic stay, and that Roennau could not sue them on the debt while the stay was in

effect.  Debtor's counsel further advised that the stay would remain in effect until a discharge

order was entered, or the Court otherwise specifically removed the stay at the request of a

creditor (which, if requested, was unlikely to be granted by the court on the facts in their

bankruptcy case).

17.     At this same meeting with Debtors to prepare for the creditor's meeting, Debtor's

counsel advised the debtors generally, and the Joint Debtor specifically, that when the discharge

order entered in their case, creditors would forever be forbidden to pursue any collection activity

against them personally on any discharged debts.  As such, they should not be concerned that

they would be personally sued on any discharged debts.  Debtors' counsel did advise, however,

that there would remain the possibility that the LLC business entity, Le Pop Shop, LLC, could be

sued on the debt separately and apart from their personal discharge, but if that occurred, there

could be no request in such a suit that the Debtors be held personally liable for the obligations of the business entity.

18.    On 20 July 2016, Debtor's counsel received faxed correspondence from Roennau's attorney stating that they acknowledged the bankruptcy filing.  The correspondence further advised that Roennau intended to pursue a non-dischargeability action in the bankruptcy case to prevent the debt owed to Roennau from being discharged.  A copy of this correspondence is attached hereto as Exhibit E.

19.    Debtor's counsel conferred with the Debtors about Roennau's debt, his threat to pursue a non-dischargeability action against them, and the potential consequences of such litigation.  Debtor's counsel also advised that if no suit for non-dischargeabilty was filed by 9 September 2016, they would be safe from Roennau and could move on to a fresh start with their financial lives.

20.    On 19 September 2016, a standard discharge was entered in the case, and served upon creditors.  This entry of the discharge order operates as an injunction pursuant to 11 U.S.C. § 524 and prohibits collection activity against the Debtors.  A copy of the discharge was mailed to Roennau by the BNC, and is attached hereto as Exhibit F.

21.    On 20 October 2016, proof of service of the business was filed on the docket in the State Court case.  A copy of the proof of service served in October 2016 is attached hereto as Exhibit G.  Further, in October, Roennau filed a Case Management Statement in the suit advising the California Superior Court that all parties had been served or dismissed.  A copy of this Case Management Statement is attached hereto as Exhibit H.

22.    On 18 November 2016, Roennau filed a dismissal of Joint Debtor in the State Court case.  It is very important to note that the dismissal was filed as a dismissal without prejudice,

even though the discharge order had already been entered.  When advised of the dismissal, and what it meant for the case to be dismissed without prejudice (i.e., that Roennau had preserved the right to potentially pursue the claim in the future), the Debtors again responded with extraordinary anxiety and concern, and stated they were terrified of Roennau and were fearful that he would not honor the discharge injunction.  The very act dismissing the offending suit *without prejudice* thus caused stress, aggravation, and suffering of the Debtors, and appears to have been part of a larger scheme to collect against the Debtors.

23.    On 9 March 2017, the Joint Debtor was served with process as agent for the business in the suit <u>for the second time</u>.  Because the business had already been served with process on 13 June 2016, and this proof of service had been filed with the State Court in October of 2016, and the Case Management Statement indicated that all parties had been served, there was no legal reason whatsoever for business to be served with process a second time.

24.    In addition to furthering collection activity against the Debtors, as set forth below, the service of process given to the Joint Debtor appears to have been deliberately intended to harm and provoke the Debtors.  For example, when the Joint Debtor received the papers this time, the process server told the Joint Debtor, as she was served, something along the lines of "This is for you.  You knew this was coming."

25.    The papers that the Joint Debtor was served on 9 March 2017 contained detailed allegations that she was to be held personally liable for the obligations of the business, and that the business was merely an alter ego of the Joint Debtor, that there was no separateness between the business and the Joint Debtor, and that it was a "fiction" that the business was a separate entity distinct from the Joint Debtor.  A complete copy of the suit is attached hereto as Exhibit I.  Some of the specific allegations in the suit are:

a) Paragraph 7 of the suit:  Plaintiff is informed and believes and thereon alleges that Le Pop Shop is, and at all times mentioned was, a mere shell, instrumentality, and conduit which Torres carried on in her business in the corporate name exactly as she would conduct without the benefit of incorporation, exercising complete control and dominance of such business to such an extent that any individuality or separateness of defendant Le Pop Shop and defendant Torres does not, and at all times mentioned herein did not, exist.

b) Paragraph 8 of the suit:  Plaintiff is informed and believes and thereon alleges that defendant Le Pop Shop, at all times herein mentioned was so inadequately capitalized that, compared with the business to be done by said defendant, it had inadequate assets to meet its financial obligations, and thus it would be inequitable for shareholder Torres to avoid the obligations of Le Pop Shop through the sham corporate entity of Le Pop Shop.

c) Paragraph 9 of the suit:  Plaintiff is informed and believes and thereon alleges that defendant Torres was the alter ego of defendant Le Pop Shop, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between such defendants, that any separateness has ceased to exist in that defendant Torres used assets of Le Pop Shop for her personal use to the detriment of creditors and other parties.

d) Paragraph 10 of the suit:  Adherence to the fiction of the separate existence of defendant corporation as an entity distinct from defendant Torres would permit an abuse of the corporate privilege and would sanction fraud and promote injustice in

that notwithstanding the fact Torres made representations to Plaintiff as more fully set forth in her individual capacity, said representations were also on behalf of the corporate entity.

26.    The suit placed in her hands by Roennau's process server requested judgment against the Joint Debtor (as the "alter ego" of the Le Pop Shop) for $237,500.00 for fraud and deceit, negligent misrepresentation, breach of fiduciary duties, breach of contract, and an accounting, as well as special request for punitive damages of $200,000.00.

27.    The Realizing that her dismissal from the suit previously had been without prejudice, and now being handed a copy of the suit again by a process server that alleged the business was not a separate entity and that Roennau was requesting damages of at least $437,500.00, the Joint Debtor suffered a severe anxiety attack.  This anxiety attack was the direct consequence of the suit being served upon her as a collection activity of Roennau, and required immediate and extensive medical care as a result, as detailed herein.

28.    The reason the Debtors were so terrified of Roennau was that the Joint Debtor's original business partner Sevilla Alexander, who had known Roennau for over 30 years, had warned her that if the business didn't work out for some reason, the Debtors would need to get a restraining order against Roennau.  Sevilla Alexander had told the Debtors that Roennau would stop at nothing to get his money back, and the Debtors believed this to be true.

29.    On July 11, 2015, Roennau told the Debtors that "Le Pop Shop will open with or without Katie."  Over the past several years, prior to their bankruptcy filing, Roennau had told the Debtors repeatedly that he would either get the business or the money back one way or another.  Prior to their bankruptcy filing, the Debtors had felt threatened by Roennau's actions

and words, which explained why they were so anxious and frightened each time Roennau came up in the bankruptcy case.

30.     Roennau asked the Joint Debtor several questions about her family, children, finances and health during the last few months they were doing business together. As a result of their conversations, Roennau has actual knowledge that the Joint Debtor suffers from stress induced illnesses of ulcerative colitis and irritable bowel syndrome.

31.     As a result of the past relationship between Roennau and the Debtors, Roennau had been to their personal residence and had met the Debtors' young children. The Debtors' children have been frightened by Roennau's previous process servers, and are terrified of him to this day because they have seen and heard him speak to the Debtors (their parents) in an awful and unprofessional manner. At age 6, the Debtors' daughter confided to her parents that she was having nightmares about Roennau and was afraid because he knew which school she attended. As a result, the Debtors felt the need to move for their safety, and enroll in a new school, with both the new address and school being unknown to Roennau. Accordingly, the Debtors did move to their new residence in a quest to pacify their fears and the fears of their children.

32.     The Debtors are unaware of how Roennau discovered their new residence, as they had moved essentially to get safety from him. The Debtors are extremely fearful of Roennau, and are convinced that he will stop at nothing to get his money back. The fact that he tracked them down in order to put a lawsuit in the hands of the Joint Debtor through a process server has terrified them even more.

33.     The Joint Debtor's stress induced illnesses of ulcerative colitis and irritable bowel syndrome have been severely aggravated by Roennau's actions in serving the suit that alleged she was responsible for the actions and obligations of the business. The Joint Debtor is unable to

perform basic motherly duties because she has to run to the bathroom constantly due to the stress caused by Roennau.  These conditions are only irritated by stress, and the Joint Debtor has been forced to spend countless hours in the restroom dealing with it.

34.    Further, the Joint Debtor has developed significant mental health issues as a direct result of Roennau's actions. She wakes up thinking about what she calls "Roennau's perpetual lawsuit and stalking", worries about it all day long, and then goes to bed thinking about it. She has developed agoraphobia and is afraid to go outside for fear of encountering Roennau or one of his agents or process servers.

35.    The agoraphobia that was developed has impacted the Joint Debtor's life dramatically, as well as the lives of her family.  At times, she is so fearful that she can't even bring herself to take her children to school, instead forcing them to walk to school on their own. This tears her up because she knows that her 7 and 10 year old children should be accompanied by her when they are in route to school, but she just can't overcome her fears of Roennau to do so.

36.    Further, as a direct result of Roennau's actions, the Joint Debtor has acquired paranoia, and is convinced that Roennau has agents tracking her and following the movements and action of her and her family.  This has compelled her to photograph "suspicious" cars parked near her home and her children's school, and causes her enormous anxiety and concern.

37.    Further, as a direct result of Roennau's actions, the Joint Debtor has also acquired debilitating depression, for which she is now under professional medical care.

38.    Further, the Joint Debtor cannot find a job in the baking industry to gain income for her family due to the stress caused by Roennau and fear of being followed or surveilled by Roennau.

BATES: 0012

39.    Further, the Debtors' children have even been adversely impacted by Roennau's actions.  The most recent process server that came to the Debtors' new residence has made them extremely fearful of all adults.  They are terrified to the point where they don't even talk to adults until their parents say it is ok for them to do so.

40.    Perhaps most significantly, after being served with the suit, and as a direct result of Roennau's actions, the Joint Debtor was referred to a psychiatrist for care and treatment.  While in treatment with her psychiatrist, the Joint Debtor revealed that she had become suicidal and believed that the only way her family would be safe from Roennau was if she was dead.  Accordingly, because he had shown utter disregard of the discharge injunction, the Joint Debtor had planned to end her life in an attempt to stop the collection activities of Roennau.

# LIABILITY UNDER 11 U.S.C. § 524 FOR VIOLATING THE DISCHARGE INJUNCTION

41.    The entry of a discharge order creates an injunction as provided by 11 U.S.C. § 524 which prohibits the continuation of an action, the employment of a process, or an act, to collect or recover an alleged personal liability of the Debtors.

42.    Any postdischarge attempt to collect or recover on a debt as a personal liability of the debtor is properly a basis for civil contempt proceedings.  *Walls v. Wells Fargo Bank, N.A.* (9th Cir. 2002) 276 F3d 502.  The matter is properly heard as a motion, and not as a separate cause of action.  *Id.* at 508; *Cox v. Zale Delaware, Inc.,* (7th Cir. 2001) 239 F3d 910.

43.    The Court is authorized to issue "any order, process, or judgment" necessary or appropriate to carry out the provisions of the Bankruptcy Code.  11 U.C.S. § 105(a).  As such, this Court may order Roennau to pay damages to Debtors resulting from his willful violation of the discharge injunction.  *Walls v. Wells Fargo Bank, N.A.* (9th Cir. 2002) 276 F3d at 507; *Sciarrino v. Mendoza* (ED CA 1996) 201 BR 541.

44.    The service of the suit was the continuation of an action, the employment of a process, or an act, to collect or recover an alleged personal liability of the Debtors, and as such, is in direction violation of the discharge injunction as provided by 11 U.S.C. § 524.

45.    The Debtors are entitled to recover their actual compensatory damages, as detailed below, that have resulted from Roennau's willful violation of the discharge injunction.  *In re Kendrick,* 75 BR 451; *In re Brantley*, 116 BR 443.

# STATEMENT OF DAMAGES

46.    The discharge violations and events described within this motion have caused a great deal of stress, literal physical suffering, debilitating mental health issues, and great expense for the Debtors.

47.    The first expense directly attributed to the discharge violations relate to the aggravation of the medical conditions described herein.  The Debtors realistically believe that the treatment for ulcerative colitis and irritable bowel syndrome required as a direct result of Roennau's actions will persist for at least 6 more months, with a treatment expense of no less than $5,000.

48.    Another expense directly attributed to the discharge violations relate to the development of the mental health conditions described herein, including, but not limited to,

agoraphobia, insomnia, depression, paranoia, and enormously significant, suicidal tendencies. The Debtors realistically believe that the treatment for these conditions required as a direct result of Roennau's actions will require no less than 3 years of intensive treatment, with a treatment expense of no less than $2,500 per month, for a total of $90,000.

49.    Another expense directly attributed to the discharge violations relate to the need for family counseling to address the developing mental health issues of the children.  The Debtors realistically believe that the counseling required as a direct result of Roennau's actions will require no less than 2 years of therapy and counseling, with a treatment expense of no less than $1,500 per month, for a total of $36,000.

50.    Another expense directly attributed to the discharge violations relate to the need for the Debtors to move to a new residence.  The Joint Debtor's medical providers have suggested that the only effective treatment for the conditions that have developed may require the Debtors to relocate, perhaps out of the state or country, to an address which must remain unknown to Roennau.  The Debtors realistically believe that the cost of relocating to a new residence required as a direct result of Roennau's actions will require an expense of not less than $100,000.

51.    Debtors believe that a reasonable value to the pain, suffering, anxiety, stress and aggravation they have suffered is no less than $1,312,500.00, representing a fair and reasonable multiple of three times the amount sought by Roennau ($437,500.00) in the suit.

52.    Because Roennau continued with his collection activities in such an outrageous manner, and with actual knowledge that the Joint Debtor had a medical condition that was aggravated by stress, an award of damages of punitive damages in an amount determined at the discretion of the court is just and appropriate, but not less than the $200,000.00 sought by Roennau for punitive damages in his collection activities through the State Court case.

53.    Up to the filing of this Motion for Sanctions and Damages Resulting From Discharge Violations, the Debtors have incurred professional legal fees and expenses of not less than $14,850.00, representing 30 hours of billable time already expended, as well as an additional 3 hours of billable time anticipated for an unopposed hearing on the motion.  If the motion is contested, Debtors anticipate that their professional legal fees will be considerably higher.

## SUPPORTING DECLARATIONS AND MEDICAL EVIDENCE

54.    A declaration of Debtor Katherine Lea Torres in support of this motion is attached hereto as Exhibit J, and is incorporated by reference.

55.    A declaration of Debtor Albert Torres, Jr., in support of this motion is attached hereto as Exhibit K, and is incorporated by reference.

56.    A declaration of Debtor's counsel in support of this motion is attached hereto as Exhibit L, and is incorporated by reference.

57.    Due to the sensitive nature of the medical records of the Debtors, the Debtors would prefer to not file those as part of the public pleadings on the docket.  However, the medical records will be available to the Court for in-camera review and to Roennau in the spirit of Federal Rules of Civil Procedure Rule 26 disclosures, as made applicable to bankruptcy cases through Federal Rules of Bankruptcy Procedure Rule 7026.

//

//

//

# CONCLUSION

Based on the foregoing, the Debtors respectfully request that the Court enter an order that provides that:

a)  The Motion is granted;

b)  Michael Roennau is found to be in willful violation of this court's discharge order pertaining to the Debtors;

c)  The Debtors have suffered actual damages and harm directly attributable to the willful violations of the discharge order in an amount not less than $1,543,500.00, or such greater amount as according to proof, and are entitled to recover same from Michael Roennau;

d)  Because the violations of the discharge order were especially egregious, willful, and outrageous, punitive damages in an amount according to proof and determined at the discretion of the court is just and appropriate, but in an amount not less than $200,000.00 and the Debtors shall recover same from Michael Roennau;

e)  The Debtors are entitled to an award of their actual attorney's fees and costs in an amount according to proof;

f)  Such other further relief as the Court may deem just and proper.

Dated this 26 May 2017.

**M Jones and Associates**
Attorneys for Debtors

Michael Jones

# Index to Exhibits

Schedule listing the debt ....................................................................... Exhibit A

Le Pop Shop Amended Operating Agreement ...................................... Exhibit B

Le Pop Shop Operating Agreement ...................................................... Exhibit C

Direct Notice to Roennau's Counsel...................................................... Exhibit D

Roennau's Counsel's Response to BK Notice ...................................... Exhibit E

Discharge Order and Notice from BNC ................................................ Exhibit F

Proof of Service on the LLC filed 20 Oct 2016 .................................... Exhibit G

Case Management Statement showing all parties served/dismissed .... Exhibit H

The Offending Suit alleging alter ego liability of Joint Debtor ............ Exhibit I

Declaration of Debtor Katherine Lea Torres ........................................ Exhibit J

Declaration of Debtor Albert Torres ..................................................... Exhibit K

Declaration of Debtor's counsel ........................................................... Exhibit L

Offer for In-Camera Review of Medical Records ................................. Exhibit M

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A.

# Schedule listing the debt

BATES: 0019

Debtor 1  **Albert Torres, Jr.**
Debtor 2  **Katherine Lea Torres**

Case number (if know)    **8:16-bk-12250**

| 4.1 1 | **McCarthy, Burgess & Wolff** | Last 4 digits of account number | **1550** | $65.48 |
|---|---|---|---|---|

Nonpriority Creditor's Name
**26000 Cannon Rd**
**Cleveland, OH 44146**
Number Street City State Zip Code

**When was the debt incurred?** _____

Who incurred the debt? Check one.

**As of the date you file, the claim is: Check all that apply**

☐ Debtor 1 only
☐ Debtor 2 only
☐ Contingent
■ Debtor 1 and Debtor 2 only
☐ Unliquidated
☐ At least one of the debtors and another
■ Disputed

■ **Check if this claim is for a community debt**

**Type of NONPRIORITY unsecured claim:**
☐ Student loans

**Is the claim subject to offset?**
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No
☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes
■ Other. Specify  **Bar Code registration for commercial goods.**

| 4.1 2 | **Michael Roennau** | Last 4 digits of account number | _____ | **Unknown** |
|---|---|---|---|---|

Nonpriority Creditor's Name
**3112 4th Street**
**Santa Monica, CA 90405**
Number Street City State Zip Code

**When was the debt incurred?** _____

Who incurred the debt? Check one.

**As of the date you file, the claim is: Check all that apply**

☐ Debtor 1 only
☐ Debtor 2 only
☐ Contingent
■ Debtor 1 and Debtor 2 only
☐ Unliquidated
☐ At least one of the debtors and another
■ Disputed

■ **Check if this claim is for a community debt**

**Type of NONPRIORITY unsecured claim:**
☐ Student loans

**Is the claim subject to offset?**
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No
☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes
■ Other. Specify  **Disputed claim for business related debts.**

| 4.1 3 | **Navient** | Last 4 digits of account number | **3350** | $10,346.00 |
|---|---|---|---|---|

Nonpriority Creditor's Name
**Attn: Claims Dept**
**Po Box 9500**
**Wilkes-Barr, PA 18773**
Number Street City State Zip Code

**When was the debt incurred?**  **Opened 10/01/11  Last Active 7/17/15**

Who incurred the debt? Check one.

**As of the date you file, the claim is: Check all that apply**

☐ Debtor 1 only
☐ Debtor 2 only
☐ Contingent
■ Debtor 1 and Debtor 2 only
☐ Unliquidated
☐ At least one of the debtors and another
☐ Disputed

■ **Check if this claim is for a community debt**

**Type of NONPRIORITY unsecured claim:**
■ Student loans

**Is the claim subject to offset?**
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

■ No
☐ Debts to pension or profit-sharing plans, and other similar debts

☐ Yes
☐ Other. Specify  _____

**Educational**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit B

# Le Pop Shop Amended Operating

# Agreement

BATES: 0021

# LE POP SHOP, LLC

*A California Limited Liability Company*

## FIRST AMENDED
## OPERATING AGREEMENT

This First Amended Operating Agreement ("Agreement") shall have an effective date of May 21, 2015, and is entered into by and among the undersigned Members of the Company. This Agreement shall supersede all prior operating agreements of the Company and Members. The undersigned Members desire this Agreement to constitute the operating agreement of the Company in accordance with the Act.

### ARTICLE I
### THE COMPANY; GENERAL PROVISIONS

1.1    Formation. The Company has been formed as a limited liability company pursuant to the provisions of the Act. This Agreement shall be effective as of the date set forth above, by and among the Company and the Persons who are Members of the Company on that date. No Person may become a Member of the Company without agreeing to and without becoming a signatory of this Agreement, and any offer or assignment of a Membership Interest is contingent upon the fulfillment of this condition, as well as the fulfillment of other conditions as may be required as set forth herein. The names and address of the Members and Manager are set forth on Exhibit A. Capitalized terms and phrases used in this Agreement shall have the meanings given those terms in Article II below.

1.2    Name. The legal name of the Company is Le Pop Shop, LLC.

1.3    Purpose. The Company's purpose, scope and intent are to make and sell pastries, notably macarons, online and through store fronts. However, other markets and opportunities may open due to growth and exposure of the brand, which may provide special opportunities for the Company and Katherine Torres. To the extent such opportunities do not compete with the brand, or dilute the brand, Katherine Torres may use and promote the brand to further her own, personal activities and pursuit of her own personal income, which activities and income shall be separate and apart from the Company. Such activities and opportunities shall include by way of example, and are not limited to, book deals, teaching engagements, and consulting engagements. Katherine Torres may also start other businesses to the exclusion of the Members and Company within the food industry but outside the pastry market. These activities and pursuits by Katherine Torres shall not be considered Company opportunities.

1.4    Intent. The Company is not a partnership and the Members are not partners. However, it is the intent of the Manager and the Members that the Company shall always be operated in a manner consistent with its treatment as a partnership for federal and state income tax purposes. It is also the intent of the Manager and the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code.

1.5    Office. The registered office of the Company within the State of California is 1508 Simplicity, Irvine, CA 92620. The Manager may change the Company's registered office to any other place within the State of California.

1.6    Agent for Services of Process. The name and address of the agent for service of legal process on the Company in California is Daniel A. Harrison, 114 Pacifica, Suite 280, Irvine, CA 92618. The Manager may change the Company's agent for service of process at any time.

1.7    Term. The term of the Company commenced on the date the Articles of Organization were files with the Secretary of State and shall continue in perpetuity until dissolved as set forth in this Agreement.

1.8    Intellectual Property and Confidentiality: The Members understand that "Le Pop Shop" and "macaronuts" are established trademarks of the Company. The Members acknowledge and agree that

1 of 21

BATES: 0022

the Company owns and possesses all rights and interest in these trademarks and use thereof. The Members do not own or possess any individual or personal rights or interest is these trademarks, and any such rights and interests are hereby transferred and conveyed in full to the Company. Additionally, the Company currently has, and will create additional, recipes and mixes for food products, which shall be treated as trade secrets of the Company and afforded the protections set forth in California's Uniform Trade Secrets Act (California Civil Code §3426, *et seq*.,) in additional to other applicable Federal and State law.

## ARTICLE II
### DEFINITIONS

Unless otherwise expressly provided herein or unless the context otherwise requires, the terms and phrases with initial capital letters used in the Agreement shall be defined as follows:

"Act" means the California Revised Uniform Limited Liability Company Act, contained in California Corporations Code § 17701.01 et seq., as amended from time to time.

"Affiliate" means any Person under the control of, in common control with, or in control of a Member or Manager, whether that control is direct or indirect. The term "control" means, with respect to a corporation or limited liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

"Agreement" means this Operating Agreement in its original form and as it may be amended from time to time.

"Articles" means the Articles of Organization filed with the California Secretary of State forming the Company, as initially filed and as they may be amended from time to time.

"Capital Account" means the amount of a Member's capital interest in the Company, consisting of the amount of money and the fair market value (net of liabilities) of any property initially contributed by the Member as (1) increased by any additional contributions and the Member's share of the Company's profits; and (2) decreased by any Distribution to that Member as well as that Member's share of Company losses.

"Capital Contribution" means the aggregate amount of money and the fair market value (net of liabilities) of any property contributed by the Members to the Company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

"Company" means the company identified in Section 1.2.

"Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations § 1.704-2(d). [26 C.F.R. § 1.704-2(d)]

"Corporations Code" means the California Corporations Code, as amended from time to time and the provisions of any succeeding law.

"Distribution" means the transfer of money or property by the Company to the Members without consideration.

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

2 of 21

BATES: 0023

"Majority Interest" means the interest of the voting Members holding greater than fifty percent (50%) of the total interests held by all of the voting Members.

"Manager" means the Person or Persons designated as such in Article V.

"Member" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not terminated membership.

"Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations § 1.704-2(b)(4). [26 C.F.R. § 1.704-2(b)(4)]

"Member Nonrecourse Deductions" means items of Company loss, deduction, or Code § 705(a)(2)(B) [26 U.S.C.A. § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

"Membership Interest" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

"Negative Capital Account" means a Capital account with a balance of less than zero.

"Net Losses" or "Net Profits" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

"Nonrecourse Liability" has the meaning provided in the Regulations § 1.752-1(a)(2). [26 C.F.R. § 1.752-1(a)(2)]

"Percentage Interest" means the percentage ownership of the Company of each Member as set forth in the column entitled "Member's Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time to time pursuant to this Agreement. The Percentage Interests shown on Exhibit A are likely approximate and stop at two decimals past a single percentage point for convenience. Calculations for taxation and Distributions of profit or loss shall be performed with reference to an appropriate fraction or by using at least eight decimal places.

"Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, association, estate, or any other natural person or entity.

"Positive Capital Account" means a Capital Account with a balance of zero or greater.

"Regulations" as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

"Secretary of State" means the California Secretary of State.

"Tax Matters Member" ("Tax Matters Partner"), as defined in Code § 6231(a)(7) [26 U.S.C.A. § 6231(a)(7)], is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

BATES: 0024

## ARTICLE III
## CAPITAL CONTRIBUTIONS AND RELATED MATTERS

3.1    Initial Capital Contributions. The Capital Contribution of each Member is listed in Exhibit A attached hereto. Exhibit A shall be revised to reflect any additional contributions pursuant to Section 3.2.

3.2    Additional Contributions. No Member shall have the right or be required to make any additional contributions to the Company. However, upon determination by the Manager that additional capital is desirable, the Manager may solicit and raise such additional capital from any source as the Manager deems appropriate. The Manager also has the discretion to increase the Membership Interests or Percentage Interests of Members who contribute and decrease the Membership Interests or Percentage Interests of Members who do not. Notwithstanding, upon receipt of additional contributions by a Member, the Members' capital accounts shall be adjusted accordingly.

3.3    Interest Payments. The Company shall not be obligated to pay and no Member shall be entitled to receive any interest payments in connection with any Capital Contribution to the Company.

3.4    Right to Return of Contributions. No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in Article IX.

3.5    Capital Accounts. A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations § 1.704-1(b)(2)(iv) [26 C.F.R. § 1.704-1(b)(2)(iv)], which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her Membership Interest in accordance with this Agreement, the successor shall succeed in interest to that portion of the Member's Capital Account attributable to the interest assigned or transferred, notwithstanding the fact that is may be a Negative Capital Account.

3.6    Failure of Member to Make Contribution. All Members shall make timely payment to the Company of the Capital Contributions described in Section 3.1. The failure of any Member to make such a contribution will render him or her in default under this Agreement. If a default occurs, the Manager will give the defaulting Member written notice that the default must be cured within fifteen (15) days from the date that such notice is mailed. If the defaulting Member fails to make the required Capital Contribution to the Company within the fifteen (15)-day period, the Manager or a majority of the nondefaulting Members may, at their sole discretion, elect to take any of the following actions:

(a) Require a Member who was to contribute property or services to contribute cash equal to the fair market value, or agreed value if stated in writing and signed by the Company and the Member, of the contribution that was not made;

(b) The Percentage Interests may be adjusted to reflect actual Capital Contributions, so that each Member's Percentage Interest may be represented by a fraction, the numerator of which consists of the Member's actual Capital Contribution and the denominator of which is the total actual Capital Contributions of all the Members;

(c) The nondefaulting Members may advance the monies owed by the defaulting Member. The monies so advanced shall be a loan due and owing from the defaulting Member to the Member or Members who advanced the monies and shall bear interest at the rate of ten percent (10%) per annum, but not to exceed the highest rate allowed by law, payable on a monthly basis. Any cash Distribution which would otherwise be made to the defaulting Member shall instead be made to the Members who advanced the funds until the obligation created thereby is satisfied. Further, the amount advanced under this provision shall be evidenced by a promissory note, due and payable within one year of the date of the advancement and any payments made thereon shall be applied first to interest and then to principal. In entering into this Agreement, each Member agrees that, upon becoming a defaulting Member, he or she grants to any Member who advances funds hereunder a security interest in his or her Membership Interest to secure the obligation to repay the funds advanced, and agrees to sign and execute

4 of 21

the promissory note described herein as well as a security agreement and UCC-1 financing statement and any other supporting documentation as the Members who advance the funds shall reasonably request;

(d) The nondefaulting Members may elect to dissolve the Company, in which case the Company shall be duly liquidated and wound up in accordance with Article IX;

(e) The Company or the nondefaulting Members may purchase the defaulting Member's interest in accordance with the terms and conditions described in Article VII, except that the purchase price shall be seventy-five percent (75%) of that which would otherwise be paid in a purchase under Article VII;

(f) The defaulting Member shall forfeit his or her voting and approval rights under this Agreement, the Articles, and the Act, until the default is cured;

(g) The defaulting Member shall lose his or her right to receive Distributions until the nondefaulting Members who advance funds to the Company shall be repaid those monies as well as a cumulative, noncompounded return thereon at the rate of ten percent (10%) per annum;

(h) The defaulting Member shall lose his or her ability to participate, whether as Member or Manager, in the management and affairs of the Company, until the default is cured; or

(i) Institute legal proceedings to recover for the Company the amount of money promised by the defaulting Member as a Capital Contribution.

Election by the Manager or majority of the nondefaulting Members to pursue any of the foregoing remedies shall not be deemed a waiver of or limitation on the right to pursue any other remedy available under this Agreement or at law or equity in the event of a subsequent default.

Each Member agrees that (1) the Company and the nondefaulting Members shall incur certain costs, obligations, and damages in the event of a default by any Member, which shall be extremely difficult to ascertain; (2) the remedies described in this Section 3.6 bear a reasonable relationship to the damages that may be suffered in the event that any Member defaults in his or her obligation to make the required Capital Contribution to the Company; and (3) election of any of the foregoing remedies would not be unreasonable based on the facts and circumstances existing as of the date that this Agreement is executed.

## ARTICLE IV
## MEMBERS

4.1    Limitation of Liability. No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his or her Membership in the Company or acting as a Manager, except as expressly set forth in this Agreement or required by law.

4.2    Additional Members. The Manager may admit additional Members to the Company and determine the additional Members' Membership Interests and Percentage Interests. Additional Members shall be permitted to participate in management at the discretion of the Manager. Likewise, the Manager shall determine an Additional Member's participation in "Net Profits," "Net Losses," and Distributions, as those terms are defined in Article II. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and percentage ownership of any Additional Members.

4.3    Withdrawal from Membership. Subject to Article VII, any Member may withdraw at any time after thirty (30) days' written notice to the Company, without prejudice to the rights of the Company or any Member under any contract to which the withdrawing Member is a party.

4.4    Compensation of Members. No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Manager. However, if approved in advance by the Manager, and only if so approved, the Members and Affiliates shall be entitled to

BATES: 0026

reimbursement for the actual cost of goods and services provided to the Company and expenses advanced or expended on behalf of the Company or in furtherance of the Company's interest.

4.5    Transactions with the Company. At the discretion of the Manager, the Manager or a Member may lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Manager or Member shall be treated like any other Person with respect to transactions with the Company.

4.6    Members Are Not Agents. Each of the Members of the Company has agreed to delegate the management of the Company to the Manager and, accordingly, expressly relinquishes any rights he or she might otherwise have to act on behalf of the Company, to incur liability on behalf of the Company or to bind the Company in any way. Unless authorized by the Act, this Agreement or the Manager, Members shall not act as agents of the Company.

4.7    Meetings. There will be no regular or annual meetings of the Members. All decisions of the Manager and voting of the Members, if any, shall be conducted informally, and such actions shall be documented only if the Manager deems such documentation necessary. However, any Manager acting alone or any Members with an aggregate Percentage Interest of twenty-five percent (25%) or more may call a formal meeting of the Members at any time, as set forth in this Section and Sections 4.8 and 4.9.

(a) Such meeting shall be held at a place determined by the Manager or, if no determination has been made, at the Company's principal executive office. The meeting shall be held during normal business hours.

(b) The Manager shall preside at the meeting and appoint a delegate to act as secretary. The secretary shall prepare minutes of the events transpiring at the meeting, which shall be maintained along with the books and records indicated in Section 8.1 at the Company's principal place of business.

(c) If any action on the part of the Members is to be proposed at the Meeting, then written notice of the meeting must be provided to each Member entitled to vote not less than ten (10) days or more than sixty (60) days prior to the meeting. Notice may be given in person, by facsimile, telegraph, or first class mail, or other written communication, charges prepaid, addressed to each Member at the address listed for that Member in Exhibit A. Notice shall be deemed complete upon personal delivery, transmission of the facsimile or telegram, or when deposited in the mail or sent in writing in some other manner. The notice shall contain the date, time, and place of the meeting and a statement of the general nature of the business to be transacted there. Matters which are not contained in the notice may not be addressed at the meeting.

(d) Any Member entitled to call a meeting may request in writing that the Manager provide the aforementioned notice to all Members entitled to vote at the meeting. If the written notice is not given by the Manager within twenty (20) days of the request, the Member may then give notice of the meeting.

(e) An affidavit of the mailing of notice shall be prepared by the Manager, Member, or other employee of the Company that actually causes written notice of the meeting to be transmitted to the Members. The affidavit shall be maintained at the Company's principal place of business, along with the books and records listed in Section 8.1.

4.8    Actions at Meetings.

(a) No action may be taken at a meeting that was not proposed in the notice of the meeting, unless there is unanimous consent among all Members entitled to vote.

(b) No action may be taken at a meeting unless a quorum of Members is present, either in person or by proxy. A quorum of Members shall consist of Members holding a majority of the Percentage Interest in the Company of those Members entitled to vote. Once a quorum has been established at a duly held meeting, business may be regularly transacted at that meeting without

BATES: 0027

adjournment, notwithstanding that the quorum is no longer present, so long as Members holding a majority of the Percentage Interest in the Company of Members entitled to vote approve any action taken.

(c) A Member may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Members are able to hear each other. A Member participating in accordance with the preceding sentence shall be deemed present at the meeting.

(d) Any meeting may be adjourned upon the vote of the majority of the Membership Interests of those Members entitled to vote represented at the meeting. A quorum of Members entitled to vote need not be present to conduct the vote. If a duly held meeting is adjourned to another time and place, no notice of the time and place of the adjourned meeting is required, if there is an announcement at the time of the adjournment of when and where the meeting is to be resumed and it is resumed within forty-five (45) days of adjournment. Notice in accordance with the provisions of Section 4.7(c) is required if a new record date for the meeting is subsequently set or if the adjournment is for a period in excess of forty-five (45) days from the date of the original meeting, in which case the Manager shall set a new record date. Any business which could have been transacted at the original meeting may be transacted at the adjourned meeting.

(e) Actions taken at any meeting of the Members, regardless of where it is held or whether it is noticed and conducted in accordance with the foregoing rules, have the same force and validity as actions taken at a duly noticed and held meeting, if there is a quorum present in person or by proxy, and if, either before or after the meeting, each Member who was entitled to vote at the meeting but who was not present in person or by proxy, signs a written waiver of notice, consent to the holding of the meeting, or approval of the minutes of the meeting. A written waiver of notice need not contain a statement of the purpose of the meeting or the business to be transacted, except if it is to be given in support of an action taken at a meeting which was not stated in the notice. All such written waivers, consents, or approvals shall become part of the records of the Company and shall be maintained at the Company's principal place of business along with the books and records listed in Section 8.1.

(f) Any Member who attends a meeting shall be deemed to have waived his or her right to object to the notice of the meeting, unless the Member expresses such an objection at the commencement of the meeting. Attendance at a meeting shall not constitute a waiver of the right to object to the transaction of any business which was not disclosed in the notice of the meeting, so long as the objection is asserted at the meeting.

(g) Members who are entitled to vote at a meeting may do so in person or by authorizing another Person or Persons to act as proxy. The proxy must be in writing, executed by the Member authorizing it, and it must be filed with the Manager or secretary, if any, of the Company. A proxy will be deemed executed if the Member's name is placed on the proxy, whether manually, typed, electronically transmitted or otherwise, by the Member or his or her attorney in fact. If the proxy does not state on its face that it is irrevocable, it shall continue in full force and effect unless either (1) the Member who issued the proxy revokes it prior to the vote pursuant to the proxy by (A) delivering written notice to the Company that the proxy is revoked, (B) issuing a subsequent proxy, or (C) attending the meeting and voting in person; or (2) the Company is notified of the death or incapacity of the Member who authorized the proxy, before the vote pursuant to the proxy is counted. Notwithstanding the foregoing, no proxy shall remain in effect for more than eleven (11) months, unless the face of the proxy indicates a longer term. The revocability of any proxy which states on its face that it is irrevocable will be determined in accordance with Corporations Code sections 705(e) and 705(f).

4.9    Actions Without Meetings. Any action that may be taken at a meeting of the Members may be taken without a meeting and without prior notice, if written consents to the action are submitted to the Company within sixty (60) days of the record date for the taking of the action, executed by Members entitled to vote holding a sufficient number of votes to authorize the taking of the action. All such consents shall be submitted to a Manager and shall be maintained as a part of the Company's records. Any Member who signs such a written consent, or the Member's proxy holders, may revoke the consent by submitting a written revocation to a Manager which is received prior to the filing with the Company of a sufficient number of written consents to authorize the taking of the action. Unless written solicitations of consent have been circulated to all Members entitled to vote, (1) notice of any action taken pursuant to

BATES: 0028

submission of written consents shall immediately be given to any Member who did not submit a written consent, and (2) if the action to be taken is the dissolution or merger of the Company, such action shall not be consummated until at least ten (10) days after notice is received by each Member who has not consented in writing to the action.

4.10    Record Date. To enable the Company to determine the Members entitled to receive notice of any meeting, to vote, to receive Distributions, to exercise any rights with regard to Distributions, or to exercise any other lawful right granted by this Agreement, the Articles, or the Act, the Manager or Members representing in excess of twenty-five percent (25%) of the Percentage Interests in the Company may fix, in advance, a record date that is not more than sixty (60) or less than ten (10) days prior to the date of such meeting or more than sixty (60) days prior to any other action. If no record date is fixed, the record date shall be determined in accordance with the Act.

**ARTICLE V**
**MANAGEMENT**

5.1    Exclusive Management. The Company shall be managed by one Manager who shall be Katherine Torres, who shall have exclusive authority, discretion, power, and control to manage the assets, personal property, brand, operations, marketing, and all business affairs of the Company, and make all decisions and perform all services incident to the management thereof, as set forth in this Agreement and the Act. The Members authorize and consent to Katherine Torres signing and filing the Amendment to Articles of Organization attached hereto as Exhibit B.

5.2    Time Commitments. The Manager shall devote the time, effort, and skill that the Manager reasonably believes is necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company. The Manager is not required to devote all of her time or efforts to the operation of the Company. Additionally, the Manager may employ others, including employees, consultants and independent contractors, to carry out and perform the labor and functions of the Company.

5.3    Management Powers. Subject to the express limitations contained in Sections 5.1 and 5.4 and elsewhere in this Agreement or in the Articles, the Manager shall have all powers necessary to carry out the purposes of and to manage the assets, personal property, and business affairs of the Company as set forth in the Act, including the powers set forth in Corporations Code §17701.05.

5.4.    Limitations on Powers. The Manager shall not be authorized to permit the Company to perform the following acts or to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest:

(a)    Amendment of the Articles or this Agreement; or

(b)    Dissolution, merger or conversion of the Company.

5.5    Election and Removal of Manager.

(a) The Company shall initially have the one Manager. The Company may, from time to time, fix the number of Managers that it shall have, upon the affirmative vote or written consent of a Majority Interest of the Members entitled to vote. However, the Company may not have less than one (1) Manager at any time. Should the Members ever desire to change the number of Managers, the Articles shall be amended to so indicate.

(1) Unless the Manager resigns or is removed, the Manager shall serve until a successor has been elected and qualified to serve.

(2) The Manager shall be elected by the affirmative vote or written consent of a Majority Interest of the Members entitled to vote.

BATES: 0029

(3) The Manager may, but need not, be a Member. The Manager need not be an individual, resident of the State of California, or citizen of the United States.

(b) The Manager may be removed at any time, with or without cause, upon the affirmative vote of Members entitled to vote holding a Majority Interest. The removal shall be without prejudice to the rights, if any, of the Manager under any employment contract with the Company.

(c) The Manager may resign at any time by providing written notice to another Manager. The resignation shall be effective immediately upon receipt of the notice, unless a later time is specified in the notice. Acceptance of the resignation is not required to make it effective, unless the notice provides otherwise. The resignation shall be without prejudice to the rights, if any, of the Company under any contract with the Manager.

(d) A vacancy shall exist if (1) the Manager is removed, resigns, or dies, (2) if there is an increase in the number of authorized Manager positions, or (3) if the Members entitled to vote fail to elect a sufficient number of Managers to fill the authorized positions. If a vacancy occurs, it may be filled by the other Managers.

5.6    **Liability for Performance of Duties; Duty of Care.**

(a) The Manager shall perform her managerial duties in good faith, in a manner that she reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in the same position would exercise in similar circumstances. A Manager who so performs the duties of Manager shall not incur any liability to the Company or Members by reason of being or having been the Manager of the Company.

(b) In performing his duties, the Manager shall be entitled to rely upon information, reports, opinions, or statements made by or received from the following Persons or groups, unless the Manager is in the possession of information regarding the matter in question sufficient to render such reliance unwarranted and provided that the Manager acts in good faith and after a reasonable inquiry when the need therefor is indicated by the circumstances:

(1) Any officer, employee, or other agent of the Company whom the Manager reasonably believes to be trustworthy and competent regarding the matters presented;

(2) Any attorney, independent accountant, or other professional with regard to matters which the Manager reasonably believes to be within such person's area of expertise or competence; or

(3) Any committee upon which the Manager does not serve, duly created in accordance with the provisions of this Agreement or the Articles, as to matters within its designated authority, which committee the Manager reasonably believes to be competent regarding the matters within the ambit of its authority.

5.7    **Transactions Between Company and Manager.** The Manager or Affiliate of a Manager may engage in transactions with the Company, notwithstanding that such transactions may constitute a conflict of interest, as long as the transaction is not expressly prohibited by this Agreement or the Act and the terms and conditions of the transaction are fair and reasonable to the Company and are at least as favorable as those that are generally available from Persons capable of providing the same or similar services as those between parties operating at arms length.

5.8    **Compensation.** To the extent the Company's revenues permit, the Manager shall be entitled to commercially reasonable compensation for her services to the Company, and shall be entitled to reimbursement for expenses advanced or expended on behalf of the Company or in furtherance of the Company's interests. A Majority Interest shall determine the Manager's compensation, and a Member who is Manager shall be entitled to vote on such determination.

BATES: 0030

5.9     Limitation on Exposing Members to Personal Liability. Neither the Company nor any Manager nor any Member may take any action which will have the effect of exposing any Member to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

5.10     Limitations on Manager's Liability. No Person who is a Manager shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager of the Company.

5.11     Membership Interests of Manager. A Manager who holds a Membership Interest shall be entitled to all of the rights and privileges of a Member who is not a Manager, including without limitation the economic, voting, information, and inspection rights, unless otherwise provided in this Agreement.

5.12     No Formal Meetings. All decisions of the Manager may be made informally, without notice or a meeting, and such actions shall be documented only if the Manager deems such documentation necessary.

## ARTICLE VI
## ALLOCATION OF PROFIT AND LOSS

6.1     Compliance with the Code and Regulations. The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

6.2     Net Profits. Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company. Percentage Interests shown on Exhibit A may be truncated for convenience. Distributions shall be made in proportion to Percentage Interests as calculated with precision.

6.3     Net Losses. Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. Percentage Interests shown on Exhibit A may be truncated for convenience. Net Losses shall be allocated in proportion to a Percentage Interests as calculated with precision. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

6.4.     Regulatory Allocations. Notwithstanding the provisions of Section 6.3, the following applies:

(a) Should there be a net decrease in Company Minimum Gain in any taxable year, the Manager shall specially allocate to each Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, § 1.704-2(f) [26 C.F.R. § 1.704-2(f)] prior to making any other allocations.

(b) Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Manager shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations § 1.704-2(i)(5) [26 C.F.R. § 1.704-2(i)(5)]. The Manager shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations §

BATES: 0031

1.704-2(i)(4) [26 C.F.R. § 1.704-2(i)(4)] to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c) The Manager shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d) The Manager shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations section 1.704-2(i) [26 C.F.R. § 1.704-2(i)].

(e) If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or Distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under Article VI, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and Distributions and no allocation pursuant to Section 6.4(e).

(f) In accordance with Code § 704(c) [26 U.S.C.A. § 704(c)] and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

6.5    Distributions. The Manager, in her sole and absolute discretion, shall decide when and how to make a Distribution that would not be prohibited under the Act or under this Agreement. All such Distributions shall be made to those Persons who, according to the books and records of the Company, were the holders of record of Membership Interests on the date of the distribution. Subject to Section 6.6, neither the Company nor the Manager shall be liable for the making of any Distributions in accordance with the provisions of this section.

6.6    Limitations on Distributions.

(a) The Manager shall not make any Distribution if, after giving effect to the Distribution:

(1) The Company would not be able to pay its debts as they become due in the usual course of business; or

(2) The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of Distribution, to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Member receiving the Distribution.

(b) The Manager may base a determination that a Distribution is not prohibited under this section on any of the following:

(1) Financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances;

(2) A fair valuation; or

BATES: 0032

(3) Any other method that is reasonable under the circumstances.

(c) Except as provided in the Act, the effect of a Distribution under this section is measured as of the date the Distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days after the date of authorization.

6.7    Return of Distributions. Members shall return to the Company any Distributions received which are in violation of this Agreement or the Act. Such Distributions shall be returned to the account or accounts of the Company from which they were taken in order to make the Distribution. If a Distribution is made in compliance with the Act and this Agreement, a Member is under no obligation to return it to the Company or to pay the amount of the Distribution for the account of the Company or to any creditor of the Company.

6.8    Guaranteed Payments. Katherine Torres shall receive guaranteed payments on a monthly basis to the extent revenues permit but limited to commercially reasonable compensation for the responsibilities, duties and tasks to be performed. The guaranteed payments are designed to compensate Katherine Torres for performing the day to day affairs and operations of the Company's business. A Majority Interest shall determine any person entitled to guaranteed payments and the dollar amount and frequency of same. Further, any interested Member may vote on all issues concerning guaranteed payments even if that Member is the person receiving the guaranteed payment.

6.9    Members Bound by These Provisions. The Members understand and acknowledge the tax ramifications of the provisions of this Article of the Agreement and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE VII
## TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

7.1    Triggering Event. In the event of a Triggering Event, the triggering Member's Membership Interest shall consist of an economic interest only and said Member's voting rights shall immediately cease with the non-triggering Members thereby having proxy to exercise those voting rights in any manner they choose, with each non-triggering Member being entitled to exercise such rights in the same proportion his/her Percentage Interest bears to the aggregate Percentage Interests of the other non-triggering Members ("Proportionate Right"). The following shall constitute a Triggering Event:

(a) A Member's attempt or effort to sell, exchange, trade, gift, change ownership of/to, assign, pledge, mortgage, hypothecate, encumber, or transfer in any way (collectively "Transfer") any of his/her Membership Interest in the Company, or any rights in said Membership Interest, without complying with the provisions of this Article VII;

(b) A Member's death or incapacity;

(c) A Member's insolvency, dissolution, filing for bankruptcy, or making any assignment for the benefit of creditors;

(d) A Member being subject to enforcement of any claim or judgment which seeks a seizure, charging order, turnover or Transfer of any Membership Interest or portion thereof;

(e) A Member's marital dissolution, divorce or legal separation which results in the Member's spouse being entitled to or awarded any Membership Interest or portion thereof;

(f) A Member's notice of withdrawal from Membership pursuant to Section 4.3;

7.2    Option to Purchase. Upon any Triggering Event, the Company shall have the immediate option to purchase all or any portion of the triggering Member's Membership Interest at the price and upon the terms set forth herein. The Company's option hereunder shall be effective upon the

BATES: 0033

Company's receipt of written notice of the Triggering Event ("Option Date"). Each Member has an express obligation to report any Triggering Event to the Company and other Members. The Company shall have thirty (30) days after the Option Date to exercise its option by providing notice of same to the triggering Member and other Members. If the Company does not exercise its option to purchase all of the available Membership Interest within the above timeframe, then the non-triggering Members shall each have a Proportionate Right to purchase the triggering Member's Membership Interest not purchased by the Company at the price and upon the terms set forth herein, by providing notice of same to the triggering Member and Company within thirty (30) days after the expiration of Company's option period.

 7.3 Membership Interest Transfers.

 (a) A Member may only Transfer a Membership Interest with the prior written consent of the Manager and a Majority Interest, which consent may be withheld for any reason, good or bad. Further, the triggering Member shall be entitled to vote on a Transfer involving or affecting the triggering Member's own Membership Interest.

 (b) Notwithstanding the foregoing, the consent of the Members shall not be required for transfers between Members, or for estate planning purposes provided the triggering Member retains sole authority and control over the Membership Interest, including all voting rights therein.

 (c) Any Transfer in violation of this Agreement: (i) shall be null and void as against the Company and the other Members; and (ii) shall not be recognized by, or reflected in the official books and records of, the Company. Notwithstanding, the Company and its Manager and Members shall incur no liability for allocations and Distributions made in good faith to a triggering Member until a valid written instrument of transfer has been received by the Company, approved as required herein, and recorded on the Company books. The triggering Member shall, to the furthest extent permitted by law, defend, hold harmless, and indemnify the Company, including its Manager and Members, from and against any and all claims, demands, liabilities, losses, and lawsuits whatsoever arising from or in any way relating to any Transfer (attempted, completed or otherwise) by that triggering Member which fails to strictly comply with this Agreement.

 (d) A permitted Transfer shall come with all rights, benefits and obligations of the Member's Membership Interest, including voting rights, if any. Any permitted Transfer of all or any part of a Membership Interest must meet the following conditions:

 (1) The transferee must provide a written agreement, satisfactory to the Manager, to be bound by all of the provisions of this Agreement;

 (2) The transferee must provide the Company with his/her taxpayer identification number and initial tax basis in the transferred interest;

 (3) The transferee must pay the reasonable expenses incurred in connection with his/her admission to Membership;

 (4) The transfer must be in compliance with all federal and state laws;

 (5) The transfer must not result in the termination of the Company pursuant to Code § 708 [26 U.S.C.A. § 708]; and

 (6) The transfer must not render the Company subject to the Investment Company Act of 1940, as amended [15 U.S.C.A. §§ 80a-1].

 7.4 Bona Fide Offer to Purchase.

 (a) Notwithstanding the above, if a triggering Member receives a bona fide written offer from a ready, willing and able third party to purchase any of his/her Membership Interest, then the Company and/or non-triggering Members shall have the option rights set forth above to: (1) purchase all of the Membership Interest either at the price and upon the terms set forth below or at the price and upon

BATES: 0034

the terms set forth in the bona fide offer, as elected by the Company and/or non-triggering Members in their sole and absolute discretion, or (2) purchase a portion of the Membership Interest as set forth below. A bona fide written offer shall include all material terms of purchase, including price, payment terms, amount of Membership Interest, timing of change of Membership Interest ownership, specific identity of purchaser (and if an entity, the identity of the entity's officers, directors, shareholders, members, managers, partners, and other controlling and owning principals). The value of all non-cash consideration shall be its fair market cash value, and the method used to determine such value shall be set forth in the bona fide written offer.

(b) If the Company and/or non-triggering Members elect to purchase a portion of the Membership Interest, the price shall equal the Proportional Price. (Proportional Price means the total purchase price as determined in accordance with the terms set forth below or total purchase price contained in the bona fide written offer, chosen by Company and/or non-triggering Members in their sole and absolute discretion, divided by the percentage of the Membership Interest to be purchased). The price shall be paid on the same terms set forth below if elected for determination of price, or on the same terms set forth in the bona fide written offer if elected for determination of price.

(c) If the Company and/or non-triggering Members fail to exercise their options to purchase any or all of the Membership Interest, the triggering Member may sell the non-purchased Membership Interest to the bona fide purchaser pursuant to the exact terms in the bona fide offer within thirty (30) days after the non-triggering Members' options expire.

7.5    Price and Terms.

(a) The purchase price shall be the "Option Price" of the Membership Interest. "Option Price" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts. The Members shall use their best efforts to mutually agree upon the Option Price. If the parties are unable to so agree within fifteen (15) days after the Company or non-triggering Members, as the case may be ("Option Buyers"), exercise their options, the triggering Member and the Option Buyers shall each appoint, within fifteen (15) days thereafter, an appraiser of their choice. The two appraisers shall then, within a period of ten (10) days after both appraisers are appointed, agree upon and select a third appraiser. The three appraisers shall, within sixty (60) days after the selection of the third appraiser, each determine the Option Price and convey such determination in writing to all participating parties. Each side shall pay for their own appraiser, plus one-half the fees and expenses of the third appraiser. If any party fails to timely appoint an appraiser, or if a party's appraiser is delinquent in conveying his/her determination, the Option Price shall be decreased for the failing selling party or increased for the failing purchasing party, as the case may be, by 5% after every ten (10) days of delinquency.

(b) The Option Price shall be determined by disregarding that appraiser's valuation which diverges the most from the two other appraisers' valuations. The arithmetical mean of the remaining two appraisers' valuations shall become the Option Price. The Option Price shall be payable in cash in thirty-six (36) equal monthly payments, at four percent (4%) simple annual interest, on the first day of each month, with the first payment being due on the first day of the month which is at least thirty (30) days after the determination of the Option Price. For example, if the Option Price is determined on March 3rd, the first monthly payment shall be due on May 1st. Any installment paid after the 5th of the month shall be deemed delinquent. In the event any installment is delinquent on more than five (5) occasions, or more than thirty (30) days on any one occasion, all installments due and not yet paid shall be accelerated and immediately due. However, in the event of Triggering Event No. 5 or 6 above, the Option Price shall be payable in sixty (60) equal monthly installments.

7.6    Drag Along Rights. In the event the Company and non-Triggering Members do not invoke their option rights as set forth above, then the Members shall have the following rights:

(a) *Drag Along Rights*: A Drag Along Sale means an agreement by one or more Members ("Dragging Members") to sell a total of fifty-one percent (51%) or more of their Percentage Interests to a third party. In the event a Drag Along Sale is agreed to, as evidenced by a writing signed by the Dragging Members, each non-Dragging Member shall be required, at the option of the Dragging

BATES: 0035

Members: (1) to sell his/her Membership Interest on the same terms and conditions as those agreed to by the Dragging Members, and/or (2) to vote in favor of a sale of all or substantially all of the Company's assets if such vote by Members is required. The non-Dragging Members shall perform any and all actions, including the execution and delivery of documents, which may be reasonably requested in order to carry out the transaction(s) contemplated herein and the non-Dragging Members hereby appoint the Dragging Members as attorneys-in-fact to perform such actions.

(b) A Drag Along Sale shall also include any agreement to sell a percentage less than fifty-one percent (51%) if, combined with sales during the preceding twelve (12) months, the combined Percentage Interests would equal or exceed fifty-one percent (51%).

(c) No Member shall engage in any transaction or series of transactions intended to circumvent these Drag Along Rights.

7.7    No Release of Liability. Any Member whose interest in the Company is sold or transferred pursuant to this Article VII is not relieved thereby of any liability he or she may owe the Company.

## ARTICLE VIII
## BOOKS, RECORDS, AND REPORTING

8.1    Books and Records. The Manager shall maintain at the Company's principal place of business the following books and records:

(a) A current list of the full name and last known business or residence address of each Member and Manager set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) Copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) The books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) True and correct copies of all relevant and existing documents and records indicating the amount, cost and value of all of the property and assets of the Company.

8.2    Accounting Methods. The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

8.3    Reports. The Manager shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Manager shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Manager shall send to each Member within ninety (90) days of the conclusion of the taxable year:

(a) All information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns;

BATES: 0036

(b) A copy of the Company's federal, state, and local income tax or information returns for the taxable year, if the Company has thirty-five (35) or fewer Members; and

(c) If the Company has more than thirty-five (35) Members, an annual report containing a balance sheet as of the end of the fiscal year as well as an income statement and statement of changes in financial position, accompanied by the report thereon, if any, of the independent accountant engaged by the Company, or, if there is no report, a signed certificate from the Manager that the financial statements were prepared from the unaudited books and records of the Company.

8.4    Inspection Rights. For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. Upon request, the Manager shall provide Members with copies of all Company records and documents to which Members are entitled under the Act.

8.5    Bank Accounts. The Manager shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions to be determined by the Manager, insured by the FDIC. The Manager shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. The Manager shall have the powers enumerated in Sections 5.1 with respect to endorsing, signing, and negotiating checks, drafts, or other evidence of indebtedness to the Company or obligating the Company to pay money to a third party.

8.6    Tax Matters Member (Tax Matters Partner). The Company initially designates its Manager as Tax Matters Member (Tax Matters Partner), as defined in Code § 6231(a)(7) [26 U.S.C.A. § 6231(a)(7)] to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations. The Manager may designate a different Tax Matters Member at any time.

## ARTICLE IX
## DISSOLUTION, LIQUIDATION, AND WINDING UP

9.1    Conditions Under Which Dissolution Shall Occur. The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) At the time specified in the Articles;

(b) Upon the vote of a Majority Interest to dissolve;

(c) Upon the entry of a decree of judicial dissolution;

(d) Upon the happening of any event specified in the Articles or this Agreement as causing or requiring dissolution; or

(e) Upon the sale of all or substantially all of the Company's assets.

9.2    Winding Up and Dissolution. If the Company is dissolved, the Manager shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

9.3    Order of Payment. After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members or the Manager who are creditors of the Company, the Manager shall distribute the remaining assets among the Members in accordance with their Positive Capital Account balances (with Additional Capital Contributions to be paid first), after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

BATES: 0037

9.4     Members' Receipt of Payment. Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member or Manager.

9.5     Certificates to Be Filed. Upon the dissolution of the Company, the Manager shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Manager shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

## ARTICLE X
## INDEMNIFICATION

10.1     Indemnification of Agents. The Company shall defend and indemnify its Members and Manager, and may defend and indemnify any other Person, to the fullest extent permitted by law from and against any lawsuits, claims, judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, Manager, officer, employee, or agent of the Company.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1     Assurances. Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Manager and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

11.2     Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

11.3     Section Headings. The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

11.4     Binding Effect. This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

11.5     Interpretation. All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

11.6     Company Counsel. Company counsel is initially Daniel A. Harrison of the law firm Berger Harrison, APC. The Members acknowledge and agree that (i) Company counsel owes them no direct duties, (ii) Company counsel's duties are owed solely to the Company, (iii) Company counsel is legal counsel for the Company only, and (iv) Company counsel does not represent any Member in their individual capacities, or otherwise. Each Member and Manager signing below consents to said Company counsel providing services with respect to formation of the Company and drafting of this Agreement. All Members are encouraged to seek their own, independent legal advice from a lawyer of their choice with respect to this Agreement and their investment in and involvement with the Company.

BATES: 0038

11.7    Applicable Law. Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not the law of conflicts, of the State of California.

11.8    Binding Arbitration. All disputes arising out of or concerning this Agreement shall be submitted to binding arbitration at JAMS of Orange County, California, pursuant to JAMS's then current rules and procedures but with the right to discovery, and with the outcome to be determined by a single arbitrator selected by JAMS, whose decision shall be final and binding on the Company and Members. The arbitrator shall determine the scope of discovery, applicable rules of evidence, and arbitration procedures. The purpose of this Binding Arbitration provision is to achieve an expedient, efficient, and cost-effective resolution of disputes and avoid the technicalities and procedural obstacles and delays that would otherwise apply in a court of law.

11.9    Specific Performance. The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy which may be available, to injunctive relief to prevent or to correct the breach.

11.10    Remedies Cumulative. The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

11.11    Notices. Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in Exhibit A, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

11.12    Amendments. Any amendments, modifications, or alterations to this Agreement or the Articles must be in writing and approved as required herein.

11.13    Severability. Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of the Agreement which shall continue in full force and effect.

11.14    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

**UNDERSTOOD, ACCEPTED AND AGREED.**

The Members' and Manager's signatures below evidence their agreement to be bound by the terms contained herein.

Members:                                                          Manager:

Katherine Torres                                          Katherine Torres

Sevilla Alexander

Michael Roenau

18 of 21

BATES: 0039

## EXHIBIT A

## MEMBERS OF LE POP SHOP, LLC

### May 21, 2015

| MEMBERS | MEMBER'S MAILING ADDRESS | CAPITAL CONTRIBUTION | MEMBER'S PERCENTAGE INTEREST |
|---|---|---|---|
| Katherine Torres | 28432 Boulder Dr. Trabuco Canyon, CA 92679 | $10,000 | 70% |
| Sevilla Alexander | 22501 Chase #1205 Aliso Viejo, 92656 | $1,000 | 5% |
| Michael Roennau | 3112 4th St. Santa Monica, CA 90405 | $125,000 | 25% |
| | TOTAL | $136,000 | 100% |

19 of 21

BATES: 0040

<u>**EXHIBIT B**</u>

| | |
|---|---|
| **LLC-2** | **Amendment to Articles of Organization of a Limited Liability Company (LLC)** |

To change information of record for your California LLC, you can fill out this form, and submit for filing along with:

- A $30 filing fee.
- A separate, non-refundable $15 service fee also must be included, if you **drop off** the completed form.
- To file this form, the status of your LLC must be active on the records of the California Secretary of State, or if suspended, this form can only be filed to list a new LLC name. To check the status of the LLC, go to kepler.sos.ca.gov.

*Important!* To change the LLC addresses, or to change the name or address of the LLC's agent for service of process, you must file a Statement of Information (Form LLC-12). To get Form LLC-12, go to www.sos.ca.gov/business/be/statements.htm.

Items 4-6: Only fill out the information that is changing. Attach extra pages if you need more space or need to include any other matters.

This Space For Office Use Only

For questions about this form, go to *www.sos.ca.gov/business/be/filing-tips.htm.*

① **LLC's Exact Name** (on file with CA Secretary of State)

LE POP SHOP, LLC

② **LLC File No.** (Issued by CA Secretary of State)

**201303710132**

**Purpose**

③ The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**New LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

④ _____

*Proposed LLC Name*    The proposed new name must include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and may not include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company.

**Management** (Check only one.)

⑤ The LLC will be managed by:

[✓] One Manager    [ ] More Than One Manager    [ ] All Limited Liability Company Member(s)

**Amendment to Text of the Articles of Organization** (List both the current text, and the text as amended by this filing.)

⑥

**Read and sign below:** Unless a greater number is provided for in the Articles of Organization, this form must be signed by at least one manager, if the LLC is manager-managed <u>or</u> at least one member, if the LLC is member-managed. If the signing manager or member is a trust or another entity, go to www.sos.ca.gov/business/be/filing-tips.htm for more information. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are part of this document.

| ▶ _____ | KATHERINE TORRES | MANAGER & MEMBER |
|---|---|---|
| Sign here | *Print your name here* | *Your business title* |

| **Make check/money order payable to: Secretary of State** | **By Mail** | **Drop-Off** |
|---|---|---|
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State<br>Business Entities, P.O. Box 944228<br>Sacramento, CA 94244-2280 | Secretary of State<br>1500 11th Street, 3rd Floor<br>Sacramento, CA 95814 |

Corporations Code §§ 17701.08, 17702.02, 17713.10
LLC-2 (REV 01/2014)

2014 California Secretary of State
www.sos.ca.gov/business/be

BATES: 0041

### SPOUSAL CONSENT

I am the spouse of a Member of the Company and who is a party to the foregoing Agreement. I have read the Agreement, I understand its contents, and I expressly acknowledge that the Agreement contains provisions by which my spouse grants the Company and/or other Members the right to purchase my spouse's Membership Interest, which may include my community property interest in said Membership Interest. I agree that any interest I have in said Membership Interest, or any interest I may acquire in the future, is subject to the provisions of the Agreement including, without limitation, the provisions in Article VII. I accept and agree to the foregoing provisions and consent to such a sale of the Membership Interest in accordance with the provisions of Article VII, should such sale occur.


Albert Torres Jr.
_____
Name of Member's Spouse

_____
Signature

_____
Name of Member's Spouse

_____
Signature

_____
Name of Member's Spouse

_____
Signature

BATES: 0042

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit C

# Le Pop Shop Operating Agreement

BATES: 0043

# Operating Agreement

## About this document

An operating agreement is an agreement among the owners ("Members") of a limited liability company ("LLC") that details the LLC's ownership structure and each Member's financial and managerial rights and duties. The main purpose of the agreement is to govern the operations of the business in a way that suits the specific needs of the business owners.

The Operating Agreement is one of the most important LLC formation documents and should be kept with the core records of your business.

## About LegalZoom

LegalZoom, Inc. was founded in 2001 and is a registered and bonded legal document assistant in Los Angeles County (LDA number 0104 expires December 2013). Our location and phone number are: 101 N. Brand Blvd., 11th Floor, Glendale, CA 91203. If you have any questions about this document, please contact us at (323) 962-8600 (Mon-Fri 6 AM – 7 PM PT).

### THIS PAGE IS FOR INFORMATIONAL PURPOSES ONLY
### YOU CAN REMOVE AND DISCARD THIS PAGE AT ANY TIME

## Operating Agreement

### Le Pop Shop LLC,
### a California Limited Liability Company

THIS OPERATING AGREEMENT of Le Pop Shop LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.     The Members have formed the Company as a California limited liability company under the California Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of California. The Members hereby adopt and approve the articles of organization of the Company filed with the California Secretary of State.

B.     The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the California Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, (3) decreased by any distributions made by the Company to such Member, and (4) otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Exhibit" means a document attached to this Agreement labeled as "Exhibit A," "Exhibit B," and so forth, as such document may be amended, updated, or replaced from time to time according to the terms of this Agreement.

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the California Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest or Units, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

    A.    If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or

    B.    If ownership in the Company is expressed in Units, the ratio, expressed as a percentage, of:

        (1)    the number of Units owned by the Member (expressed as "MU" in the equation below) divided by

BATES: 0046

(2)     the total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below).

$$\text{Percentage Interest} = \frac{MU}{TU}$$

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Units" mean, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, entitles the Member to a Membership Interest which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1  **Initial Capital Contributions.** The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2  **Subsequent Capital Contributions.** Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members in a consent in writing, the Members may make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3  **Additional Members.**

A.      With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by a unanimous written agreement signed by all of the existing Members.

-3-

BATES: 0047

B.    Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Members deem necessary or desirable, including, but not limited to, a signed consent in the form of Exhibit C. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4  **Capital Accounts.** Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5  **Interest.** No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6  **Limited Liability; No Authority.** A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the California Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1  **Allocations.** Unless otherwise agreed to by the unanimous consent of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2  **Distributions.** The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Members in accordance with the California Limited Liability Company Act.

-4-

BATES: 0048

**3.3  Limitations on Distributions.** The Company must not make a distribution to a Member if, after giving effect to the distribution:

A.     The Company would be unable to pay its debts as they become due in the usual course of business; or

B.     The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

**4.1  Management.**

A.     **Generally.** Subject to the terms of this Agreement and the California Limited Liability Company Act, the business and affairs of the Company will be managed by the Members.

B.     **Approval and Action.** Unless greater or other authorization is required pursuant to this Agreement or under the California Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by the Members, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Members authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

C.     **Certain Decisions Requiring Greater Authorization.** Notwithstanding clause B above, the following matters require unanimous approval of the Members in a consent in writing to constitute an act of the Company:

(i)     A material change in the purposes or the nature of the Company's business;

-5-

(ii)    With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

(iii)    The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

(iv)    The amendment of this Agreement.

4.2  **Officers.** The Members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the Members determine from time to time. Each officer will continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the Members; or (b) the officer is dismissed or terminated by the Members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Members, and may be terminated, at any time and for any reason, by the Members. The officers of the Company will be listed on Exhibit B, as may be updated from time to time according to the terms of this Agreement.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1  **Accounts.** The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

-6-

5.2  **Records.** The Members will keep or cause the Company to keep the following business records.

    (i)    An up to date list of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

    (ii)    A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

    (iii)    A copy of the articles of organization of the Company, as may be amended from time to time ("Articles of Organization"); and

    (iv)    An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3  **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4  **Subchapter S Election.** The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulations.

5.5  **Tax Matters Member.** Katherine Lea Torres is designated as the tax matters member of the Company to represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated with any such examination. A new tax matters member may be appointed by the Members from time to time.

BATES: 0051

5.6  Banking. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Members are authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 1: MEMBERSHIP – VOTING AND MEETINGS

6.1  **Members and Voting Rights.** The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the California Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the California Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2  **Meetings of Members.** Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. Meetings may be called by any Member or Members, holding 10% or more of the Percentage Interests, for the purpose of addressing any matters on which the Members may vote. A written notice setting forth the date, time, and location of a meeting must be sent at least ten (10) days but no more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the California Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the California Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1  **Withdrawal.** Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the

BATES: 0052

Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account, which must be paid by the Company to such Member within ninety (90) days of the withdrawal date unless otherwise agreed in writing.

7.2 **Restrictions on Transfer; Admission of Transferee.** A Member may transfer Membership Interests to any other Person without the consent of any other Member. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

## ARTICLE 8: DISSOLUTION

8.1 **Dissolution.** The Company will be dissolved upon the first to occur of the following events:

(i) The vote of the Members holding at least a majority of the Voting Interest of the Company to dissolve the Company;

(ii) Entry of a decree of judicial dissolution under California Limited Liability Company Act;

(iii) At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

(iv) The sale or transfer of all or substantially all of the Company's assets;

-9-

BATES: 0053

(v)     A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

**8.2  No Automatic Dissolution Upon Certain Events.** Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

**9.1  Indemnification.** The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Governor, officer, employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a "Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under California law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees, and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

**9.2  Mandatory.** The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, California law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

**9.3  Expenses Paid by the Company Prior to Final Disposition.** Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification). Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the

-10-

BATES: 0054

applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

10.1 **Notice.** (a) Any notices (including requests, demands, or other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2 **Entire Agreement; Amendment.** This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement, except as otherwise required by the California Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the California Limited Liability Company Act.

10.3 **Governing Law; Severability.** This Agreement will be construed and enforced in accordance with the laws of the state of California. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and

-11-

BATES: 0055

replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4  **Further Action.** Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5  **No Third Party Beneficiary.** This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6  **Incorporation by Reference.** The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7  **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

*[Remainder Intentionally Left Blank.]*

BATES: 0056

**IN WITNESS WHEREOF**, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

Dated: _04 / 10 / 13_____

_____
Signature of Katherine Lea Torres

-13-

BATES: 0057

## EXHIBIT A
## MEMBERS

The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement, including, but not limited to, Sections 2.1, 2.3, 2.4, 4.1(c)(ii), 7.1, 7.2, and 10.1.

| Members | Capital Contribution | Percentage Interest |
|---|---|---|
| Katherine Lea Torres<br>Address:<br>1508 Simplicity<br>Irvine, CA 92620 | $2,000.00 | 100% |

-14-

BATES: 0058

## EXHIBIT B
## OFFICERS

Officers of the Company are set forth below.

| Name of Officer | Title |
|---|---|
| Katherine Lea Torres | President |

-15-

BATES: 0059

## EXHIBIT C
## NEW MEMBER'S CONSENT

The undersigned agrees to be bound as a Member of the Company by the terms of the Operating Agreement of Le Pop Shop LLC attached hereto as if the undersigned was a signatory thereof.

(Signature)

Name: Katherine Torres

Date: 4/10/15

-16-

BATES: 0060

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit D

# Direct Notice to Roennau's Counsel

BATES: 0061